MEMORANDUM OF DECISION
On February 2, 2000, the Department of Children and Families, hereafter "DCF," filed a petition seeking to terminate the rights of Desiree L. and Wilfredo F., Sr, to their son, Wilfredo F. The termination petition alleges that Wilfredo had been abandoned by his father and that there is no ongoing parent-child relationship between him and his father. The petition also alleges Wilfredo was previously adjudicated neglected and his biological parents have not rehabilitated so that they could care for him in the foreseeable future. Connecticut General Statutes §17a-112(j)(3)(A), (B), and (D). In addition, DCF claims it made reasonable efforts to reunify the parents with the child and that the parents are unable or unwilling to benefit from reunification efforts.
The trial of the case was conducted on June 7, June 26, July 2 and ended on August 9, 2001. Both parents and their counsel attended the trial and contested the DCF claims. Due to the facts found and for the reasons set forth below, the court grants the petition for the termination of the parental rights of Desiree L. and Wilfredo F., Sr. to Wilfredo F.
From the eyidence presented, the court finds the following facts:
 A. FACTS
Desiree is now forty years old and Wilfredo is the youngest of her five children, Wilfredo's sister, Destiny, who is just ten months older than he, is also the child of Wilfredo F., Sr. His three older sisters have different fathers. His parents were never married, although his father has acknowledged his paternity. At the time of his birth, his parents were not living together. His mother has had involvement with illegal drugs for some years and at the time of Wilfredo's birth admitted to use of illegal drugs during the last seventeen years of her life. She has also experienced difficulty in her choice of partners with whom she engaged in domestic violence. DCF's first involvement with Desiree took place when her oldest child, who is now seventeen, received injuries to his abdomen while still a young child. There were other referrals for physical abuse and neglect through the years.
1. Wilfredo's Medical Condition
DCF's involvement in Desiree's life began again with Wilfredo's birth on December 1998. Desiree had had no prenatal care for this child and he CT Page 12614 was born at home. He was brought to the hospital and a hospital nurse contacted DCF as Wilfredo weighed a little over a pound, was premature at twenty-three weeks of gestation and tested positive for cocaine and morphine.[2] Wilfredo was born with numerous life-threatening medical complications. His primary diagnosis at that time was "extreme prematurity with respiratory distress syndrome" and his secondiary diagnoses included "prenatal drug exposure, pneumothrax, interventricular hemorrhage, seizures, chronic lung disease, ventriculitis, urinary tract infection, hypotension, retinopathy, feeding advancement, hydrocephalus and inguinal hernia."[3] Wilfredo was a critically ill premature baby.
After his birth, Fernando was transferred to Yale New Haven Hospital where he remained for four months until his discharge on April 27, 1998 to a foster home equipped to care for this extremely medically fragile and extremely handicapped infant. While still in the hospital, he was operated on a number of times to place a shunt into his head to drain off the excess spinal fluid accumulating in his brain.
His foster mother, a registered nurse, testified about his condition when he caine into her home. She stated that soon after he was placed in her care, she brought Wilfredo to the Connecticut Children's Medical Center, as his shunt did not appear to working. His head was also greatly enlarged due to the excess fluid in his brain. In June, 1998, when she brought him there, a neurologist immediately replaced Wilfredo's shunt. At that time, Wilfredo's eyes were rolling, he was vomiting, and he had seizures. His foster mother testified that he was in a life threatening condition and that shunt failure remains life threatening to Wilfredo. She stated that Wilfredo has had a total of eight shunts. His present shunt drains the excess spinal fluid from his head into his artery as the earlier shunts which all drained into his abdominal cavity have failed.
She testified about Wilfredo's present care needs and medical condition. He is legally blind, and has limited hearing, he cannot speak and he cannot walk. He also cannot be nourished in the ordinary way, but is fed through a gastrointestinal feeding tube. He requires careful twenty-four-hour-a-day monitoring. He has cerebral palsy and must, for his lifetime, have a shunt in his brain, as without it, he would die. His daily care requires multiple professionals. His foster mother testified that the nighttime is the most critical time in his daily medical care routine.
On the second day of her testimony in court, she stated that she had had night duty the night before and provided the nursing care to the foster and adopted children in her home. She described the evening. Wilfredo cried a few times and his monitor beeped six times. His pulse rate was low and she had to adjust him and work with him about eight CT Page 12615 times that night. He is on a cardiac and respiratory monitor. She stated that Wilfredo cannot sleep lying down, but is in an upright seat so that there will be no shunt collapse. Something must always be placed under his back to keep him straight. His feeding tube is on all night and whoever cares for him must make sure that it is not clogged, air does not get in and the flow is going into the tube and Wilfredo's stomach. He is fed gastrointestinally about twenty-two hours a day to receive adequate nutrition. Because Wilfredo cannot speak and has no voice, when he is crying or in distress, she said "we need to have him near, otherwise he turns blue. He often has trouble breathing." She noted that he is kept in visual contact all the time.
In the foster mother's opinion, the evening before had been a good night for Wilfredo and that on bad nights, she often "had to suction him every two to four hours. If he has a fever or anything, she noted, "then he has more respiratory problems and requires using a machine, which provides drugs to help him breathe and open his air-ways." She stated that primarily registered nurses provide his daily care. She noted that his vital signs must be checked frequently during the day and night. She testified that when his shunt fails, his pulse and blood pressure are depressed very quickly and the fluid also builds up in his brain quickly. He therefore can quickly slide into unconsciousness and the fluid build-up applies an enormous amount of pressure to his brain. She noted that even when in the hospital, when one of the shunts failed, instead of several days or a week of such fluid buildup, it happened in a matter of hours. When Wilfredo was operated on, the pressure caused by the build-up of spinal fluid in his brain had driven his brain stem down into his neck.
Wilfredo has cerebral palsy, which she noted was brain damage, which results in muscular damage. Wilfredo's foster mother noted that he has a bit more "hypertonic than spastic cerebral palsy" and that his muscles are not developed enough. She noted that since he has been free of surgical intervention, he has been able to develop some. He is sometimes in a special wheel-chair, but he is able to crawl on the floor a bit and play with the other children of his age in the home, who also suffer from cerebral palsy. She stated that Wilfredo is not able to be active or play for more than one half-hour at a time without becoming exhausted, but that he loves to play. She said he is a happy cheerful child.
Wilfredo also receives the services of a medically trained aide employed by the town board of education. The aide testified to the care that she provides for him. She assists in his feeding and stated that he cannot eat normally as there is the constant danger of aspiration. She discussed the fact that in the daytime, he is given bolus feedings and is not on the machine and the feeding pump, which feeds him through his CT Page 12616 "g-tube" automatically at night. She does exercises with him. She noted that Wilfredo is now active and happy and is used to being around people. "He knows the people around him, when he wants you to pick him up, he holds up his arms. He can play different games and he anticipates what you are going to do to him." She noted that he "cannot stand or walk on his own, he kind of scoots around and pulls himself up to stand." She testified that Wilfredo is never left alone and is always in the care of someone with medical training. By all accounts, Wilfredo remains an extremely medically fragile child with profound disabilities. Any lapse of attention in his care could result in his death. He will never recover from his conditions during his lifetime.
The aide has always assisted during Wilfredo's visitation with his parents at the DCF office. She transports him with all of the necessary medical equipment as well as portable oxygen, which he sometimes requires. She has trained his mother, Desiree, to perform bolus feedings during visitation, as it is part of her function to provide such training to the parents. She noted that she has mostly provided this to Desiree and not Wilfredo, Sr. She testified that she explained to Desiree how to change his diaper, feed him and use the oxygen. She explained how the "g-tube" worked and the different positions he could not be in and what was best for him. She stated that she also explained the shunt and its function to Desiree. While Desiree was able to do the things the aide spoke to her about after being trained, the aide noted that Desiree "sometimes did not want to admit that Wilfredo was that sick." Desiree has also observed to the social worker that Wilfredo would get better, which sadly is not medically possible except in very limited ways by further surgical interventions. He will never be a normally developing child.
2. The Parents' Efforts to be Reunified with Wilfredo
(a) Efforts of Desiree L.
Desiree L. was permitted to visit Wilfredo at Yale New Haven Hospital during the first four months of his life while he slowly reached a body weight of six pounds and while the hospital attempted to stabilize his condition. Visiting him regularly was one of the expectations issued for her in the neglect matter then pending before the court. Specifically, she was to participate in parenting and family counseling as well as drug counseling and was required to cooperate with random drug screen and tests. She was also to cooperate with medical training concerning Wilfredo.[4] She visited four times before his discharge.
DCF applied for and received an order of temporary custody on April 30, 1998 and placed Wilfredo in the home of his present foster mother. CT Page 12617 The DCF social worker involved in the case at that time stated "Desiree did not understand why [Wilfredo] was not coming home with her." On November 2, 1998, Wilfredo was adjudicated a neglected child as his parents could not provide him with the care and attention that he required. He was also adjudicated an uncared-for child as their home could not provide the specialized care he needed. He was committed to the care and custody of DCF on that date and his commitment has been extended since that date. He has never been in the day-to-day care of his parents.
At the time of his birth, Desiree had three of her four older children in her care, the oldest being in the care of a relative. They were also removed from her care due to Desiree's drug use and other difficulties and then returned to her after a brief period of time.[5] Since the time of Wilfredo's placement in a specially licensed foster home for medically fragile children, Desiree has visited with him inconsistently. She was offered approximately 132 visits[6], of those she failed to attend thirty-four, although a few were canceled due to her work schedule or other reasons by Desiree. Many were unexcused absences when Desiree did not call to cancel the visit and did not show up. Another eighteen did not take place because of reasons within DCF's control, such as lack of transport, Wilfredo's illnesses and the like.
The aide who transports Wilfredo to the DCF office for visitation and who attends the visitation sessions to provide both supervision and medical backup testified at length about the visitation sessions as did a DCF social worker case assistant who is also a registered nurse assistant. The aide who works with Wilfredo in the foster home as well as transports him to the DCF office noted that Desiree did not always pay proper attention to Wilfredo and at times appeared more interested in speaking to the adults present than interacting with him. She stated that after watching many visitation sessions that she "had fears for the child if he is not in a supervised setting. When he did not have control over his balance and could not speak, I would be concerned about this if he is not in a supervised atmosphere and would be concerned if he would fall or anything like that." She noted that Desiree was quick to anger, not at Wilfredo but about other matters, and that this was also a concern of the alde, that "the anger was not controlled." She noted that during one of sessions when Desiree was angry, Desiree handed Wilfredo over to her abruptly. She stated that "any time there is anger, Wilfredo is at risk." She observed that Wilfredo required full time attention from a parent and that the attention required is definitely more than a parent would normally have to give a child. She agreed that neither of the parents was able to show the devotion necessary to care for this child.
The DCF case aide echoed these sentiments. She stated that she had CT Page 12618 concerns about the parents because Wilfredo needs twenty-four-hour-a-day care. She had difficulty seeing him in a home setting with just his family. She noted that apparently Desiree planned for her other children to assist in Wilfredo's care and that this was inappropriate. She also observed that Desiree's full time attention was often not on the child and "her time was not just totally given to him." When questioned about Desiree's understanding of the nature of her son's medical problems, the DCF social worker stated "I wonder if she realized the severity of his condition." She did believe Desiree to be a caring person who loved her son. She thought that because "[Wilfredo] was so ill and not responsive like an ordinary child, it was hard to keep her attention [on him.]"
Desiree was also not successful in her drug treatment program with repeated drug screens showing the use of illegal drugs over the period of time in question. She has been in treatment at the Connecticut Counseling Center since 1997 and while she attended for some time, she tested positive for cocaine in April, May, June and August of 1998. In 1999, a similar pattern repeated itself with positive screens in February, July and August. In the following year, she again tested positive for cocaine in September, October, November and in January, 2001. It was as a result of this most recent use that the Center recommended inpatient treatment for Desiree, with which she did not comply. She had also been receiving Methadone maintenance treatment when the random drug screens showed the presence of cocaine again. Following the recommendations from the Center, Desiree became less willing to cooperate with DCF and has refused to sign releases so that DCF could obtain the Center's records in the ordinary course as they had in the past.
Her drug counselor testified that Desiree was discharged from treatment on March 12, 2001 for non-compliance with the rules and regulation of the program. This was because of Desiree's out-of-control behavior and drug use that this was done. Desiree has not had any therapy since that time. The counselor also testified that Desiree's acting out surprised her, as she had developed a positive relationship with her during the years of counseling. She noted that she had warned Desiree about her behavior and that a discharge would follow if it did not change. She also spoke about Desiree's anger and how she was "loud and says things that she does not mean and calms down afterwards."
Desiree did attend one parenting class in 1998, but given the enormous difficulties of caring for a disabled youngster such as Wilfredo while also caring for her three older children, the court finds this was not adequate compliance with the specific steps provided to her. The court finds, given her conduct, that Desiree required additional parenting training and appears not to have significantly benefited from the short course she did take. Her counselor at the Connecticut Counseling Center CT Page 12619 recommended that Desiree receive more anger management counseling because of her anger problems, towards others as well as DCF. This is a step that Desiree also did not take.
Desiree was also evaluated by a court-appointed psychologist, who testified at trial. Dr. Ramos-Genier noted that Desiree had a "somewhat willful personality style and was opinionated and oppositional. She questions authority and voices her opinion quite strongly at times and lets other people know how she disagrees with them." She noted that when she saw Desiree with Wilfredo, the child knew her and was familiar with her. She testified that Desiree was very appropriate with her son and was careful so that he would not hurt himself. She talked to him and was affectionate with him." Nonetheless, in her opinion, Desiree would have "more difficulty handling multiple responsibilities at the same time. She will therefore have difficulty in situations which call for her to assess a situation and then make a determination what is the most appropriate way to proceed." She noted that "adding a [severely handicapped] child to her home would challenge her ability to cope with the stressors added by his medical needs." She recommended that Desiree's parental rights to Wilfredo be terminated as this was best for the child.
Because of Desiree's increased drug use, DCF opened a case concerning her three older children, which most recently resulted in their removal from the home, although it is hoped they will be able to return soon. It is apparent from the most recent events in Desiree's life that her drug use had continued and accelerated in 2001.
Desiree testified on her own behalf on the last day of trial. Her concern and desire to have Wilfredo in her care was very apparent. Her failure to rehabilitate, understand and comprehend the severity of her own drug use was also apparent in her responses to the questions asked. In her answers, Desiree demonstrated to the court what a long way she has still to go to be able even to parent her three healthy children. The court finds, from the clear and convincing evidence, that Desiree had not been able to rehabilitate herself as of August 9, 2001, so that she was in a position to care for her three older children, much less provide the exhausting and twenty-four-hour attention to Wilfredo that his medical care would require.
(b) Efforts of Wilfredo, Sr.
Wilfredo F., Sr. is now thirty-five years old. He has not maintained contact with DCF and there is not a great deal of information about him. He, like Desiree, has a lengthy criminal record. His most recent arrest was on May 18, 2001 for violation of a protective order against Desiree. He currently also has charges pending for possession of CT Page 12620 narcotics. He has been convicted of many earlier charges, including burglary, has spent time incarcerated and is a convicted felon.
He has visited Wilfredo significantly fewer times than Desiree and has not made any attempts to learn how to manage his medical care. He testified at trial on his own behalf and stated that his plan for the child was that Desiree should care for him and if not, some of his relatives could do so. He has no present plans to become a primary caretaker of Wilfredo. The court finds from the testimony that he has not provided any gifts, letters or cards for Wilfredo nor recognized any important milestones in his life. He has not kept in touch with DCF nor inquired about Wilfredo.
He, like Desiree, was provided with specific steps on May 8, 1997 just after Wilfredo was placed in foster care. He was to participate in parenting, individual and drug and alcohol counseling as well as to have a drug evaluation and to follow the recommendations of such evaluation. While he participated in an evaluation, that evaluation recommended inpatient treatment for him on September 19, 2000. He has not had such treatment or any other drug treatment since that time. He met none of the specific steps. He made no inquiries of DFC nor requested any referrals. While his counsel has argued that DCF had a duty to seek him out and make such referrals, the court does not so hold. First, a parent must evidence some interest in a child and when contacted by DCF make some inquiries. One cannot provide services to a parent in a vacuum when that parent demonstrates no interest. Had Wilfredo, Sr. accepted inpatient drug treatment and made some progress, most likely other referrals would have been made. Further, the DFC social worker noted that on the rare occasions when Wilfredo Sr. was available, information was provided to him. In Wilfredo's case, he made himself remarkable by his absence.
The court finds that Wilfredo was uncommunicative and uncooperative and failed to seek any assistance with his multiple and significant life problems. While on two occasions during visitation sessions when Wilfredo was more responsive and able to play, his father was able to interact with the child and did so appropriately, this is not adequate interest in his son. Consistent with this pattern, Wilfredo, Sr. did not participate in the psychological evaluation. Further, the court had an opportunity to observe Wilfredo's demeanor during his testimony. From that and the context of the testimony, the court finds that Wilfredo, Sr. was more concerned about maintaining his own life, protecting himself from DCF and any possible support enforcement action than providing for his son. He was not a credible witness about events concerning DCF or his own actions.[8]
 C. ADJUDICATORY TERMINATION FINDINGS
CT Page 12621
1. Reasonable Reunification Efforts.
In order to terminate parental rights. DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes § 17a-112(j)(1). The court finds from the clear and convincing evidence that both Desiree and Wilfredo, Sr. were unwilling and unable to benefit from reunification efforts. The court finds from the clear and convincing evidence that DCF provided many services to the parents to assist them. Desiree was unable to benefit from them and Wilfredo made little or no effort to participate.
[7] Exhibit 3, page 2 (Editor's Note: Footnote 7 excluded in text of original document filed with the court.)
2. Adjudicatory findings
 A. Desiree L.
The termination petition alleges that Wilfredo was previously adjudicated neglected and that his mother has not rehabilitated so that she could care for him in the foreseeable future. Connecticut General Statutes § 17a-112(j)(3) ((B). Wilfredo was adjudicated a neglected child on November 2, 1998. In conducting the inquiry whether DCF has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider the respondent's rehabilitative status as it relates to the needs of the particular child and whether the prospects for rehabilitation can be realized within a reasonable time, given the age and needs of the child.
 "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time. In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
Desiree, as noted, is no closer now to assuming a responsible parental position in Wilfredo's life than she was several years ago. In fact, since 1998, despite her intentions her actual progress has been negative. Her drug use continues unabated and essentially untreated, although she had made progress in treatment until earlier this year. She was homeless and CT Page 12622 without the basic necessities of providing care for the three older children in her care in June of this year. Her ability to provide the exceptional care that Wilfredo requires has never been demonstrated. The court finds from the clear and convincing evidence that this ground has been proven.
B. Wilfredo F., Sr.
Three grounds have been alleged against Wilfredo's father. In addition to the allegation that Wilfredo F., Sr. has failed to rehabilitate so that he could parent his son, the termination petition alleges that he has abandoned this child and that there is no ongoing parent-child relationship between them. Wilfredo does not offer himself as the caregiver for his son, but first offers Desiree and if she cannot have the child, he offers his relatives. In this respect he has admitted he cannot care for him and that he has not and will not rehabilitate so that he could provide this child's primary care. The court also finds this ground proven from the other clear and convincing evidence concerning his failure to rehabilitate.
The court further finds that DCF has proven by clear and convincing evidence that Wilfredo has abandoned his son, as that term is used by the statutory ground. [The abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In re Kezia M., 33 Conn. App. 12, 18,632 A.2d 1122 (1993). "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); In re Rayna M., 13 Conn. App. 23,37-38, 534 A.2d 897 (1987); In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, (1986).
Wilfredo has visited with his son at most three times. This is not a reasonable parental degree of concern. He has not learned about his son's complicated medical conditions or inquired regularly about his welfare. He has been notable mainly by his absence and lack of interest. The court finds from the clear and convincing evidence that he has abandoned Wilfredo.
The third allegation is that there is no ongoing parent-child relationship between Wilfredo and his biological son. Given Wilfredo's absence in his young son's life, it is readily apparent that he has no parental relationship with him, although he has been able to interact with him in an extremely limited manner. It is difficult to know, given young Wilfredo's condition, anything in detail about the emotional connections CT Page 12623 he may have to any adult. What is clear, as stated by the evaluator and other observers, is that this child has a very close and special relationship with his foster mother. He responds to her, he looks for her when she is not present and interacts with her preferentially above all others. He does not enjoy such a connection to anyone else.
Nonetheless, even if Wilfredo had visited with his son as often as permitted and taken the necessary steps to learn about his care, to bond with an infant would require a parent's daily presence in a young child's life. Such a constant presence was not permitted in this case. The Connecticut Supreme Court in In re Valerie D., 223 Conn. 492, 613 A.2d 748
(1992) held that it was error to proceed under this ground where DCF removed a child at birth and, under the facts of that case, created the circumstances which virtually assured that there would be no viable way in which to develop a parent-child relationship. In the case before the court, given young Wilfredo's cognitive and other limitations as well as the limited amount of time that his father could have spent with him, the court finds that this ground cannot stand. The court holds this despite finding by clear and convincing proof that this father and son do not have an ongoing parent-child relationship. The court therefore dismisses the last ground.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(k).
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit both Wilfredo and Desiree and services for the child. Great effort was made to provide regular visitation and to give the parents the training they would require to care for this child. DCF also provided case management services.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that both parents were unable to benefit from them.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for both biological parents, who were not able to fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. The court CT Page 12624 has detailed above that Wilfredo does not relate to either of his parents, although he interacts with his mother. He is close to and responds warmly to his foster mother. He has been in her care for all of his young life that has not been spent in a hospital.
5) Finding regarding the age of the child: Wilfredo is now three years and nine months old. He will be four on December 2001.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their homes in the foreseeable future and (A) the extent to which they have maintained contact with the child as part of an effort to reunite the child, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Desire has made efforts to maintain contact with Wilfredo whereas his father has made minimal efforts. Neither parent has adjusted his or her circumstances to the extent that he or she could care for the child in the foreseeable future.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. There was no evidence of such conduct and the court so finds.
 E. DISPOSITION
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In reCT Page 12625 Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the one ground alleged against Desire and two of the three grounds alleged against Wilfredo have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which weigh in favor of termination. The court concludes, from the clear and convincing evidence that young Wilfredo deserves to have permanency.
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Wilfredo that his parents' rights to him be terminated.
The court therefore orders that the parental rights of Desiree L. and Wilfredo F., Sr. to Wilfredo F. are hereby terminated. The court approves of the present permanency plan for Wilfredo. The court appoints the Commissioner of the Department of Children and Families as Wilfredo's statutory parent. The court directs that further plans be filed for this child in accordance with state and federal law.
 Barbara M. Quinn, Presiding Judge Child Protection Session